NEW-YORK,
October, 1818.

SALTUS and others *against* THE UNITED INSURANCE
COMPANY.

SALTUS
v.
THE UNITED
INS Co.

THIS was an action of *assumpsit* upon a policy of insurance, dated the 8th of *May*, 1812, underwritten by the defendants, on account of the plaintiffs, on the cargo of the *American* brig *Syren*, *Cobb*, master, from the vicinity of *Sandy Hook*, to her port of discharge in *Sweden* or *Russia*, with liberty to call and wait at *Gothenburg* for orders. In case of capture or detention, the insured stipulate not to abandon in less than six months after advice thereof at the office of the defendants, or until after condemnation ; and the defendants assumed the risks usually enumerated in the printed policies used by the insurance companies in the city of *New-York*. The cause was tried before Mr. J. *Yates*, at the *New-York* sittings, in *November*, 1816.

The cargo of the brig *Syren* was taken on board at the *Spanish Main*, from whence she proceeded towards *New-York*, and having arrived off *Sandy Hook*, was there detained, by the direction of the plaintiffs, to avoid the operation of the embargo then existing, for some days, after which she commenced the voyage insured, and on the 14th of *July*, 1812, arrived in *Wingo Sound*, near *Gothenburg*. She remained at anchor in *Wingo Sound* until the 24th of *July*, on which day the master received intelligence of the late war between this country and *Great Britain*. To avoid *British* capture, the master took a pilot on board, and immediately proceeded for the town of *Gothenburg*, as a place of safety, where he arrived on the 26th of *July* ; the vessel having in the mean time struck on a rock, her cargo was necessarily taken out. In consequence of this accident, repairs were required, and the vessel was again ready for sea, and her cargo reloaded, in *September ;* but it was impossible for her to pursue her voyage to *St. Petersburgh*, without the certainty of capture. The *Baltic* was thronged with *British* cruizers ; several were stationed in *Wingo Sound*, one or more of which were always in sight from *Gothenburg*, and the vessel must have attempted to pass them, to get to

Where a vessel in the prosecution of the voyage insured, puts into a port, at which she is permitted by the policy to stop, and whilst there, the place is closely invested by the cruisers of the enemy of the country to which she belongs, so that if she attempted to escape, she would inevitably be captured, this is a *restraint of princes*, or *of men of war*, within the risks enumerated in the policy, and the insured may break up the voyage, and abandon for a total loss, although there is no direct application of physical force to the subject; and such abandonment is not liable to the objection that it is made *quia timet*. If after the commencement of the voyage insured, a war breaks out between the country to which the property belongs, and a foreign country, the policy is not vacated, and the insurers are liable for a loss arising out of the state of war.

sea. The voyage, in consequence, was abandoned in *April*, 1813, the vessel sold, and the cargo stored.

On the 30th of *April*, 1813, the plaintiffs wrote to the defendants, informing them that " the vessel with the cargo on board was at *Gothenburg*, and there restrained by ships of the enemy, which continually blockaded the port of *Gothenburg*, and prevented her proceeding on the voyage insured;" and also offering to abandon. On the 24th of *March*, 1814, the plaintiffs abandoned the cargo to the defendants, and claimed for a total loss. The requisite preliminary proofs were exhibited.

A verdict was taken for the plaintiffs, by consent, subject to the opinion of the court on a case, which either party was at liberty to turn into a special verdict, or bill of exceptions.

*Colden*, for the plaintiffs, contended, 1. That the impracticability of pursuing the voyage, in this case, after war was known, was a justifiable cause of breaking up the voyage, and of abandonment, on that ground, for a total loss. It was true, he said, that there were cases in which it had been decided, that the fear of capture would not justify an abandonment, yet it was admitted, in those cases, that if there was such a physical force present as rendered the capture certain, in case the assured attempted to proceed or encounter the peril, he might break up the voyage and abandon. Thus in *Schmidt* v. *The United Ins. Co.* (1 *Johns. Rep.* 249.) the actual blockade of the port of destination was held to be a sufficient reason for breaking up the voyage. Though the court, in the case of *Craig* v. *The United Ins. Co.* (6 *Johns. Rep.* 252.) decided, that the insured could not abandon from *fear* of capture, or *quia timet*, where the danger is remote or contingent, yet they recognize the principle that where there is a *moral certainty* of capture, it will justify the assured in breaking up the voyage. *Kent*, Ch. J., in delivering the opinion of the court in that case, in which all the authorities are fully examined, says, " if the port of *B.* had been absolutely interdicted, so that the prosecution of the voyage to a conclusion had become impracticable, or been attended with a moral certainty of seizure and loss, I should have deemed it equivalent to actual restraint, to the existence of a *vis major* breaking up the voyage." Now, it is a fact in the pre-

sent case, that the *Syren* could not have pursued her voyage to *St. Petersburgh*, without the *certainty of capture.*

2. The sale of the vessel at *G.* and leaving the cargo in the hands of the agent of the owners, was no waiver of the right to abandon. (1 *Caines' Rep.* 292. 6 *Johns. Rep.* 310. 9 *Johns. Rep.* 1.)

3. The reason assigned for making the abandonment was the true one; the restraint of the enemy by a continual blockade of the port.

4. If the court should be of opinion that the plaintiffs cannot recover for a total loss, they will be entitled to a return of premium, with interest, according to the terms of the policy, the risk having ended at *Gothenburgh.*

*S. Jones, Jun.* and *Wells,* contra. This is the first attempt to recover on a policy of insurance for total loss, on the ground that the intervention of war, and the consequent probability of capture, is a sufficient cause of abandonment, without any attempt on the part of the insured to proceed on the voyage. No doubt, the war greatly increased the risk; but that is one of the perils insured against. Such a fact may justify a deviation or delay, not a total abandonment of the voyage. The notice of abandonment is on the ground of a *blockade* of the port. The insured in making his abandonment must assign the true cause. He cannot avail himself of any other cause, or of any subsequent event. (*Suydam* v. *Mar. Ins. Co.* 1 *Johns. Rep.* 181. S. C. 2 *Johns Rep.* 138.) If the plaintiffs have not made out a case to entitle them to recover for a total loss, neither have they shown sufficient to recover for a partial loss.

But we insist that there was no justifiable cause of abandonment. In *Oliver* v. *The Maryland Ins. Co.* (7 *Cranch's Rep.* 487.) *Marshall,* Ch. J., in delivering the opinion of the Supreme Court of the *United States,* speaking of the danger that would justify delay, says, " it must not be a mere general danger, indefinite in its application and locality. If it were so, in time of war, any delay, however long, in a port, would become excusable; for there would always be danger of capture from the enemy's cruisers. Nor is it sufficient that the danger should be extraordinary; for then

any considerable increase of the general risk would autho-
rize a similar delay. The danger, therefore, must be obvious
and immediate, in reference to the situation of the ship at the
particular time. It must be such as is then directly applied
to the interruption of the voyage, and imminent; not such as
is merely distant, contingent, and indefinite." Instead of go-
ing into *Gothenburg* as soon as the captain heard of the war,
he ought to have proceeded to *St. Petersburgh.* Is the in-
crease of the risk, by the intervention of war, a justifiable
cause of abandonment in any case? There is nothing of
the kind in the policy. The term ' restraints of princes,'
does not embrace the case. It applies to the restraint of a
neutral. A belligerent does not restrain, but captures his
enemy. *Blockades* and *embargoes* laid by belligerents
on neutrals, are restraints by the authority of the law of na-
tions. The neutral has no right to resist such a restraint,
but is bound to submit to the force ; to resist would be an
unlawful act, and subject his property to confiscation. Be-
ing thus lawfully hindered from prosecuting his voyage, he
may abandon it, and call on the insurers for his indemnity.
A belligerent owes no submission to the force of his enemy;
but it is his right and his duty to resist or evade it, to the ut-
most of his power. If an *enemy* happens to be in posses-
sion of the port of destination, or blockades it, it will not
justify an abandonment of the voyage; it only excuses a de-
viation. This principle has been settled in the *English*
courts. (*Hadkinson* v. *Robinson,* 3 *Bos. & Pull.* 388. 392.
*Lubbock* v *Rowcroft,* 5 *Esp. N. P. Rep.* 50.) The assur-
ed are bound to go on, because they may resist or evade a
hostile force ; but as it is contrary to the duty of a neu-
tral to resist a belligerent restraint, exercised under the
law of nations, he cannot, therefore, be asked or re-
quired to proceed. The principle laid down in *Lubbock v.
Rowcroft,* has since been frequently recognised. (*Blacken-
hagen* v. *London Ass. Co., Park,* 6th ed. 226 1 *Camp.
N. P. Rep.* 450. *Forster* v. *Christie,* 11 *East,* 205.) In
order to bring a loss within the policy, the peril insured
against must act directly, and not collaterally, on the thing
insured. In the case of *Craig* v. *The United Ins. Co.
Kent,* Ch. J. alludes to the cases just cited, as denying the

right to'the assured to abandon the voyage, if an *enemy* creates the impediment; and reserves his opinion on that point, when the case shall arise. (6 *Johns. Rep.* 253.) His observations, therefore, must be all taken in reference to the particular case before him. The cases stated by *Emerigon* (1 *Emerig. Trait. des Ass.* 507. 512.) are to show when the vessel and cargo may be abandoned by the master and crew, as for fear of being taken and made slaves, when chased by pirates or corsairs, and there is no chance of escape or defence; or, on account of the plague on board; or where the vessel having struck a rock, the lives of the crew were in such imminent danger, that they took to the shore as the only means of safety. The danger, to be equivalent to that *vis major*, which will justify the assured in abandoning the vessel, must be so imminent and certain, as to render escape morally impossible. The principles laid down in *Craig* v. *The United Ins. Co.* are decisive on this question. Here was, in fact, no actual blockade of *Gothenburgh*. It is true, that there were one or more *British* ships stationed in *Wingo Sound*, and many were cruising in the *Baltic;* but although the risk of capture was thereby greatly increased, it was not a peril direct, immediate, and certain.

Again; the voyage was actually broken up, and the cargo deposited with the agent of the owners, long before any notice of abandonment. The plaintiffs were too late, after having sold the vessel, and broken up the voyge, to make the abandonment; besides, the plaintiffs did not make an actual abandonment, until a year after the notice was given. It is true, in case of a justifiable abandonment duly made, the master and owners are agents of the insurers; yet if they do acts inconsistent with the character of agents, they will be deemed to have elected to act on their own account, and not for the insurers.

Again; this is an insurance on the cargo; and *Swedish* vessels were perfectly free to enter and depart from *Gothenburgh;* and the cargo might have been sent, under the *Swedish* flag, to its port of destination. The plaintiffs have rendered no account of the cargo; nor have they shown what has become of it.

NEW-YORK,
October, 1818.

SALTUS
v.
THE UNITED
INS. Co.

*T. A. Emmet*, in reply.   The *Syren*, when the declara-
tion of war was known, was in a peculiar situation, so sur-
rounded by the ships of the enemy, that it was impractica-
ble for her to get out of *Gothenburgh*, without the certainty
of capture.   It is a much stronger case of a fear of capture,
equivalent to a *vis major*, than that of *Craig* v. *The Uni-
ted Ins. Co.*, or of any cited from *Emerigon*.   *Wingo Sound*
was a fixed station for *British* ships, and a place of rendez-
vous for *British* cruizers, during the whole of the war.   Sir
*James Saumarez*, with his fleet, was lying there, when the
master of the *Syren* was informed of the war, and he had,
three days before, applied for leave to sail, under the pro-
tection of a *British* convoy, to avoid capture by *Danish*
privateers.   If there can be a case of just fear equivalent
to that violence which will justify an abandonment, this is
such an one.   Was it reasonable, in a commercial view,
and policies of insurance are intended to protect merchants
in their reasonable speculations, to keep the vessel and
cargo at *Gothenburgh* until the end of a war, the period of
which it was impossible to calculate ?   The true question is,
did the master or owner fairly exercise his judgment, under
the circumstances in which the property was placed ?   Was
not his conduct reasonable and just ?   Did he not do what
every discreet and prudent man would have done in the
same circumstances ?

There is no material variance between the grounds stated
in the notice of abandonment, and those on which it was
actually made.   There is precisely the same set of circum-
stances ; there are no different or new facts stated in the
abandonment.

The plaintiffs, or their master, have done no more than to
land and warehouse the cargo.   If the abandonment was
justifiable, it is no matter, as regards this action, in whose
hands the cargo was placed.

THOMPSON, Ch. J. delivered the opinion of the court.
No objection can be made against the sufficiency of the no-
tice and cause of abandonment.   A true statement of the
facts, with respect to the situation of the vessel at *Gothen-
burgh*, was made, and given to the underwriters.   Whether

it was to be deemed, in judgment of law, a restraint or a blockade, would not alter the rights of the assured growing out of such a state of facts. The real question, therefore, is, whether such a state of things existed, as to warrant an abandonment, and throw the loss upon the underwriters. The policy is in the usual form, and is very broad and comprehensive, in the enumeration of the perils insured against. It would seem to reach almost every risk to which a vessel and cargo may be exposed, in the course of a voyage. The loss in this case may, I think, fairly fall within the risk of *restraint of princes, or of men of war.* It is not necessary, to constitute a loss by this peril, that actual physical force should be applied to the subject insured. The case of *Schmidt* v. *United Ins. Co.* (1 *Johns. Rep.* 249.) was considered a loss by restraint of princes, when, in fact, there was only a blockade of the port of destination, and no actual physical force was exercised. A blockade was deemed equivalent to any other restraint or detention, which includes every peril arising from a *vis major*, which could not be resisted. It equally interrupts and destroys the voyage. In a late case decided in the Supreme Court of the United States, (*Oliver* v. *Union Ins. Company*, 3 *Wheat. Rep.* 183.) it was held, that a vessel within a port blockaded after the commencement of her voyage, and prevented thereby from proceeding, sustained a loss by a peril within that clause in the policy insuring against the arrests, restraints and detainments of kings, &c. and the insurers were made responsible for the loss. Ch. J. *Marshall* said, the term *restraint* in the policy, does not imply that the restriction or confinement must be imposed by those who are in possession of the thing or person which is restricted or confined ; but the term is satisfied by a restriction created by the application of external force ; that although the blockading force is not in possession of the vessels inclosed in the harbour, yet it acts upon, and restrains them. It is a *vis major* applied directly and effectually to them, which prevents them from coming out of port.

This cannot be considered an abandonment *quia timet*, when the danger was remote and contingent. The case shows, very fully, that the harbour of *Gothenburg* was so in-

NEW-YORK, October, 1818.

SALTUS
v.
THE UNITED
INS. CO.

vested by the *British* squadron, as to make it morally certain that the *Syren* would have been captured had she attempted to go out. A state of war existing between us and *Great Britain*, there could be no reasonable grounds even to hope that she would have been permitted to pass the squadron; and an attempt to escape would have been idle. The restraint, therefore, operated as effectually, as if she had been actually seized. It would, to be sure, have been no violation of duty, or of national law, to have attempted to force through, or elude the squadron, but it would have been madness in the master, and a violation of his duty to all parties, to have rushed headlong into the arms of the enemy, when a loss would have been inevitable. The language of the late Chief Justice, in the case of *Craig* v. *The U. Ins. Co.* (6 *Johns. Rep.* 252.) is very strong on this point; and the principles laid down in that case are applicable here. It is there said, that when such restraint actually exists, and is ascertained to be effectual, and no doubt arises of its being exerted, it would be most unreasonable to require the assured to go on, and submit to the experiment of a capture. This would be fatal to the interest of all parties; it would be against the duty of the assured, and he would be placed under a moral inability to do it.

The only circumstance which, in any manner, distinguishes this case from those I have referred to, is, that the blockade was by the squadron of a power at war with this country. Had not hostilities commenced, there could be no doubt that the restraint occasioned by the blockade would have been a loss within the policy, and justified the abandonment. I cannot see any substantial reason, why that event should vary the principle. It would have been lawful to insure against capture by the enemies of this country. The breaking out of the war did not dissolve the contract of insurance; and I cannot discover, in any of the cases referred to as supporting such a distinction, any thing to warrant the conclusion that has been drawn. All those cases came under the review of this court, in the case of *Craig* v. *United Insurance Company*; and although it is said, that they seem to hold up such a distinction,

yet it is very far from being sanctioned, or approved of by this court. We are, accordingly, of opinion, that the plaintiffs are entitled to recover a total loss, and that judgment must be entered on the verdict.

<div align="center">Judgment for the plaintiffs.</div>